UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Western Division)

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ACT MANUFACTURING, INC., et al., | ) Case No. 01-47641 (JBR) |
| | ) (Substantively Consolidated) |
| Debtors. | ) |
| | ) |
| | ) |
| CRAIG R. JALBERT, LIQUIDATING CEO, AS | ) |
| REPRESENTATIVE OF THE ESTATE OF | ) |
| THE CONSOLIDATED DEBTORS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| EMERSON ELECTRIC CO., | ) Adv. Pro. No. 03-04781 |
| | ) |
| Defendant. | ) |

**DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND SUPPORTING MEMORANDUM**

Pursuant to Fed. R. Civ. P. 56, made applicable herein by Fed. R. Bankr. P. 7056,

Defendant Emerson Electric Co. ("Emerson"), by and through its counsel, hereby moves for

summary judgment on the sole count in the above-captioned adversary proceeding.

In accordance with MLBR 7056-1 and District Court Local Rule 65.1, simultaneous with

the filing of this Motion, Emerson is filing its Statement of Undisputed Material Facts in Support

of Defendant's Motion for Summary Judgment and Supporting Memorandum (the "Statement of

Facts") and its Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment

and Supporting Memorandum (the "Appendix"). Based on the Statement of Facts and the

declarations and documents referenced in the Statement of Facts and attached to the Appendix,

all of which are incorporated herein by reference, Emerson is entitled to summary judgment as a

matter of law.

## PRELIMINARY STATEMENT

On or about December 17, 2003, the Liquidating CEO (the "LCEO") of ACT Manufacturing, Inc. et al. (collectively, the "Debtors") filed a Complaint alleging the Debtors made a $1,116,317 transfer to Emerson and seeking to avoid and recover such transfer under Sections 547 and 550(a). Notwithstanding these allegations, Emerson is entitled to summary judgment for each of the following reasons:

A.  The Complaint (i) fails to state a claim upon which relief can be granted under either Section 547 or 550 because the Complaint fails to name either the "creditor" for whose benefit the transfer was paid or any "transferee" of the transfer (Emerson is neither the "creditor" nor a "transferee"), and (ii) fails to join an indispensable party because the Complaint fails to name the "creditor" for whose benefit the transfer was paid (Emerson is not the "creditor");

B.  Assuming, arguendo, that the Complaint could proceed without naming either the "creditor" or a "transferee", the transfer is not subject to avoidance because the "creditor" possessed a valid right of setoff in excess of the amount of the transfer, which fact (a) establishes that the transfer did not enable the "creditor" to receive more than it would have received in a Chapter 7 case had the transfer had not been made, as required by Section 547(b)(5), and (b) establishes the contemporaneous exchange of "new value" for purposes of Section 547(c)(1);

C.  Assuming, arguendo, that the Complaint could proceed without naming either the "creditor" or a "transferee", the transfer is deemed to have occurred prior to the 90-day preference period;

D.  Assuming, arguendo, that the Complaint could proceed without naming either the "creditor" or a "transferee", the Debtors represented in publicly-filed financial statements that they were solvent at the time of the transfer, precluding avoidance under Section 547(b)(3); and

E.  Assuming, arguendo, that the Complaint could proceed without naming either the "creditor" or a "transferee", based on this Court's Order with respect to the sale of substantially all of the Debtors' assets, the LCEO is estopped from avoiding or recovering the transfer.

## STANDARD FOR SUMMARY JUDGMENT

Emerson is entitled to summary judgment if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.  See Fed. R. Civ. P. 56(c) (made applicable to this proceeding by Fed. R. Bankr. P.

7056); see also Murphy v. Arrow Electronics., Inc. (In re RISC Mgmt., Inc.), 304 B.R. 566, 577

(Bankr. D. Mass. 2004).  In U.S. Trust Co. v. Raritan River Steel Co. (In re Am. Spring Bed

Mfg. Co.), 153 B.R. 365, 371 (Bankr. D. Mass. 1993), the court elaborated on the standards as

follows:

> The burden of proof is on the moving party to demonstrate the lack of a genuine
> issue of material fact.  The moving party bears the "initial responsibility" of
> asserting the basis for this motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323,
> 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  However, the movant is not
> required to negate his opponent's claim with affidavits or similar materials.
> Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2552.  The movant may discharge
> his burden by merely "showing—that is, pointing out to the district court—that
> there is an absence of evidence to support the nonmoving party's case.  Id. at 325,
> 106 S. Ct. at 2554. "

To defeat a motion for summary judgment, the opposing party must produce substantial

evidence of a genuine dispute as to a material fact.  Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir.

1975), cert. denied, 425 U.S. 904 (1976).  "A material issue is one which affects the outcome of

the litigation.  To be considered 'genuine' for Rule 56 purposes a material issue must be

established by 'sufficient evidence supporting the claimed factual dispute . . . to require a jury or

judge to resolve the parties' differing versions of the truth at trial.'"  Id. (quoting First Nat'l Bank

of Arizona v. Cities Serv. Co., Inc., 391 U.S. 253, 289 (1968)).

Moreover, to defeat a motion for summary judgment, the non-moving party must do

more than simply show that there is some doubt as to the facts of the case.  "The mere existence

of a scintilla of evidence in support of the [opposing party's] position will be insufficient" to

forestall summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Thus,

once the moving party has established his burden of proof, the party opposing the motion for summary judgment must establish the existence of a genuine issue of material fact and may not rest upon its pleadings or mere assertions of disputed facts to defeat the motion. <u>Matsushita</u> <u>Elec. Ind. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

Emerson respectfully submits there is no genuine issue as to any fact material to the Complaint. The LCEO bears the burden of proof on each of the elements of Sections 547(b) and 550(a). On the undisputed facts, the LCEO cannot prove, as a matter of law, elements in each of Section 547(b) and 550(a). Therefore, the grant of summary judgment in favor of Emerson is required.

## **ARGUMENTS**

**A.    By Failing To Name Either The "Creditor" Or A "Transferee", The LCEO Has: (1) Failed To State A Claim Upon Which Relief Can Be Granted, And (2) Failed To Join An Indispensable Party**

Fisher-Rosemount Manufacturing Limited d/b/a Fisher Rosemount World Wide Distribution n/k/a Emerson Process Management Distribution Limited ("FR UK"), Fisher-Rosemount Europe Middle East and Africa GmbH and Fisher-Rosemount Limited entered into a Business Sale Agreement (the "Business Sale Agreement") dated July 1, 2001 with ACT Manufacturing, Inc. ("ACT US") and ACT Manufacturing UK Limited ("ACT UK") pursuant to which, among other things, ACT US and ACT UK agreed to purchase certain assets (the "Assets") and certain inventory (the "Inventory") and to assume certain liabilities (the "Assumed Liabilities" and, together with the Assets and the Inventory, the "Leicester Business") related to FR UK's circuit board assembly business located in Leicester, England. (Statement of Facts ("SOF") ¶ 1)

The September 27, 2001 $1,116,317 wire transfer at issue (the "Transfer") constituted payment of the second installment under the Business Sale Agreement (the "Second Installment") due on September 29, 2001 (the "Second Installment Date").[1] (SOF ¶ 9)

Each of the elements contained in Sections 547(b)(1), (2), (4) and (5) are specifically addressed to the "creditor" with respect to the transfer at issue, as are the affirmative defenses set forth in Section 547(c). See 11 U.S.C. § 547. Section 550(a) is specifically addressed to a "transferee" of the alleged transfer, not a party deemed to be a "mere conduit" of such transfer. See In re Anton Noll, Inc., 277 B.R. 875, 879 (1st B.A.P. 2002) (holding that, in order to qualify as a 'transferee' under Section 550(a), a party must (1) actually have received the transfer in question, and (2) have had full dominion and control over such transfer for its own account, as opposed to receiving such transfer in trust or as agent for someone else) (emphasis added).

The following undisputed facts establish that (i) Emerson was not a "creditor" of ACT US with respect to the Transfer, and (ii) Emerson was not a "transferee" of the Transfer, but rather a "mere conduit" of the Transfer:

(a)  FR UK was the "Seller" under the Business Sale Agreement (SOF ¶ 1);

(b)  Emerson was not a party to the Business Sale Agreement (SOF ¶ 10);

(c)  Pursuant to Section 1.3(b) of the Business Sale Agreement, ACT US and ACT UK were jointly and severally liable to pay the Second Installment to FR UK, not to Emerson (SOF ¶ 4);

(d)  By letter dated August 24, 2001, Fisher-Rosemount Systems, Inc. n/k/a Emerson Process Management, an affiliate of FR UK, informed ACT US that payment of the Second Installment was to be made to FR UK (not Emerson) at its account with Barclays Bank PLC in London, England (SOF ¶ 7);

(e)  Emerson received the Transfer as agent for FR UK and did not have full dominion and control over the Transfer for its own account (SOF ¶ 11);

---

[1]  For purposes of this Motion, Emerson is assuming the funds used to make the Transfer constituted property of the Debtors. However, Emerson does not admit that such funds were, in fact, property of the Debtors.

(f)   On or about October 15, 2001, Emerson transferred the amount of the Transfer to FR UK (SOF ¶ 12); and

(g)   With respect to all payments that Emerson received from ACT US or ACT UK on account of amounts due and owing under the Business Sale Agreement, including the Transfer, (i) Emerson received such payments as agent for FR UK, (ii) Emerson never had full dominion and control over such payments for its own account, and (iii) Emerson remitted such payments to FR UK (SOF ¶ 13).

As a result of its failure to name either the "creditor" for whose benefit the Transfer was paid or a "transferee" of the Transfer, the single count contained in the Complaint fails to state a claim against Emerson (which is neither the "creditor" or a "transferee") on which relief can be granted. Accordingly, judgment cannot be rendered against Emerson under either Section 547 or under Section 550, and the Complaint must be dismissed.

Furthermore, the Complaint must be dismissed because it fails to join the "creditor," which constitutes an indispensable party under Fed. R. Civ. P. 19(b) (made applicable herein by Fed. R. Bankr. P. 7019). Both the law and common sense dictate that a preference action under Section 547 must include the "creditor."

Complete relief cannot be granted if the "creditor" is not named in the Complaint because the "creditor" (unlike a "mere conduit") holds both a vested interest and an evidentiary advantage in refuting the allegations under Section 547(b) and in establishing its defenses under Section 547(c). See Fed. R. Civ. P. 19(a)(1). The "creditor" must (if feasible) be joined in order to ensure that the "creditor" be given a full and fair opportunity to protect its interests vis-à-vis the Complaint. Fed. R. Civ. P. 19(a)(2) (requiring the joinder of any person who claims an interest relating to the subject matter of the action if the disposition of the action may "as a practical matter impair or impede the person's ability to protect that interest").

However, the "creditor" cannot now be joined as a defendant under the Complaint because the statute of limitations under Section 547 expired on December 21, 2003. <u>See</u> 11 U.S.C. § 546(a).

A judgment rendered under Section 547 in the absence of the "creditor" would be prejudicial to both Emerson and the "creditor," and the absence of the "creditor" prevents the Court from being able to render effective relief. <u>See</u> <u>Acton Co., Inc. of Massachusetts v. Bachman Foods, Inc.</u>, 668 F.2d 76, 80-81 (1st Cir. 1982). Accordingly, the "creditor" described in Section 547 is an "indispensable" party under Fed. R. Civ. P. 19(b), and the action must be dismissed for failure to join such party. <u>See</u> <u>id.</u>

## B.    FR UK's Valid Right Of Setoff Defeats The LCEO's Claims For Avoidance Of The Transfer

Assuming, <u>arguendo</u>, that the Complaint can proceed, which Emerson expressly denies, the Transfer is not avoidable under Section 547 by virtue of the valid right of setoff that FR UK possessed with respect to the Second Installment. As set forth below, the existence of FR UK's valid right of setoff (a) establishes that the Transfer did not enable FR UK[2/] to receive more than it would receive in a Chapter 7 case if the Transfer had not been made; and (b) establishes a contemporaneous exchange for "new value" under Section 547(c)(1). Thus, the LCEO cannot meet his burden of proof under Section 547(b)(5), and the undisputed facts establish also a complete defense under Section 547(c)(1).

---

[2/]    Section 547(b)(5) requires that the transfer in question must have enabled "<u>such creditor</u>" to have received more than it would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfer had not been made and "<u>such creditor</u>" had received payment to the extent provided by the Bankruptcy Code. 11 U.S.C. § 547(b)(5). The Complaint erroneously alleges that the Transfer enabled Emerson (who is <u>not</u> "such creditor") to have received more than it would have received in a Chapter 7.

**(1)**    **FR UK Possessed A Valid Right Of Setoff**

Section 553 expressly preserves a creditor's right of setoff.  FR UK had a valid right of setoff against ACT US in an amount in excess of the amount of the Transfer.  Section 553 authorizes setoff under the following conditions: (i) the proposed setoff must involve mutuality of obligations, i.e., "a debt which arose prior to commencement of the bankruptcy case, is owed by Creditor A to Debtor, while at the same time Creditor A has some claim against Debtor which likewise arose prior to commencement of the bankruptcy case"; and (ii) the creditors asserting setoff must possess a valid right of setoff under either federal or state law.  Public Service Co. of New Hampshire v. New Hampshire Electric Cooperative, Inc. (In re Public Service Co. of New Hampshire), 884 F.2d 11, 14 (1st Cir. 1989).

Pursuant to Section 1.3(b) of the Business Sale Agreement, ACT US and ACT UK were jointly and severally liable to FR UK for payment of the Second Installment. (SOF ¶ 4)

On or about July 2, 2001, Fisher-Rosemount Systems (a divisional trade name used by certain Fisher-Rosemount entities, including FR UK) and certain of its affiliates (collectively, the "FR Divisions") and ACT US entered into a division supply agreement (the "FRDSA"), whereby the FR Divisions agreed to purchase, among other things, products manufactured by the Leicester Business. (SOF ¶¶ 14-15)

In connection with each purchase by FR UK under the FRDSA, ACT UK issued an invoice to FR UK for products purchased pursuant to the FRDSA. (SOF ¶ 19)  In accordance with the FRDSA, even though ACT US could invoice FR UK through ACT UK, and FR UK could make payment to ACT UK, ACT US would at all times remain and be accountable as the supplier of the products and would credit any such payments as if made to ACT US directly. (SOF ¶ 17)

On September 23, 2001, FR UK owed approximately $2,900,000 for purchases under the FRDSA (the "September 23 Amount"). (SOF ¶ 21)

On September 29, 2001 (the due date for the Second Installment), FR UK owed ACT US approximately $2,000,000 for purchases under the FRDSA (the "September 29 Amount"). (SOF ¶ 22)

On December 21, 2001 (the "Petition Date"), FR UK owed approximately $3,400,000 for purchases under the FRDSA (the "December 21 Amount"). (SOF ¶ 28)

Pursuant to Section 7.16 of the Business Sale Agreement, FR UK was entitled to set off any amounts owing by FR UK to ACT US pursuant to the FRDSA against any amounts owed by ACT US to FR UK pursuant to the Business Sale Agreement which were not paid in a timely manner.  (SOF ¶6)  Pursuant to the FRDSA, FR UK could exercise its right of setoff and offset any amounts due to ACT US under the FRDSA against any amounts owed by ACT US to FR UK under the Business Sale Agreement. (SOF ¶ 16)

Based upon the following undisputed facts, (i) FR UK had a right to offset the Second Installment against the September 29 Amount (such setoff, the "FRDSA Setoff"), and (ii) the FRDSA Setoff would have been permissible under Section 553:

(a)    Both the Second Installment and the September 29 Amount arose prior to the Petition Date (SOF ¶¶ 3, 22);

(b)    Pursuant to the terms of the FRDSA, FR UK owed the September 29 Amount to ACT US (SOF ¶¶ 17, 22);

(c)    Pursuant to Section 1.3(b) of the Business Sale Agreement, ACT US owed the Second Installment to FR UK (SOF ¶ 4); and

(d)    FR UK possessed a valid right of setoff under state law because, in addition to its common law or statutory right of setoff, FR UK possessed a contractual right of setoff under both the Business Sale Agreement and the FRDSA (SOF ¶¶ 6, 16).

If FR UK had performed the FRDSA Setoff, the FRDSA Setoff would not be avoidable under Section 547(b). See In re Holyoke Nursing Home, Inc., 273 B.R. 305, 309-10 (Bankr. D. Mass. 2002) ("It is well settled that offsets are not transfers avoidable pursuant to Section 547(b)"); In re Massachusetts Gas & Electric Supply Co., Inc., 200 B.R. 471, 473 (Bankr. D. Mass. 1996) (holding that the legislative intent was to exclude setoff from the definition of "transfer"). Moreover, the Trustee could not have recovered any amount of the FRDSA Setoff under Section 553(b). See 11 U.S.C. § 553(b). As of both September 23, 2001 (90 days prior to the Petition Date) and September 29, 2001 (the earliest date on which FR UK could have performed the FRDSA Setoff), there was no "insufficiency" (as defined in Section 553(b)(2)) because the amount of the Second Installment was less than both the September 23 Amount and the September 29 Amount. See 11 U.S.C. § 553(b)(2).

Based upon the following facts, if the Second Installment had remained unpaid on the Petition Date, FR UK would have held a secured claim on the Petition Date for at least the December 21 Amount:

    (a)    Both the Second Installment and the December 21 Amount arose prior to the Petition Date (SOF ¶¶ 3, 28);

    (b)    Pursuant to the terms of the FRDSA, FR UK owed the December 21 Amount to ACT US (SOF ¶¶ 17, 28);

    (c)    Pursuant to Section 1.3(b) of the Business Sale Agreement, ACT US owed the Second Installment to FR UK (SOF ¶ 4); and

    (d)    FR UK possessed a valid right of setoff under state law because, in addition to its common law or statutory right of setoff, FR UK possessed a contractual right of setoff under both the Business Sale Agreement and the FRDSA (SOF ¶¶ 7, 16).

The secured claim held by FR UK on the Petition Date would have been entitled to payment in full. See 11 U.S.C. § 506(a); Braniff Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d

1030, 1034 (5th Cir. 1987) (recognizing that a right of setoff results in a secured claim under

Section 506(a)); In re Santoro Excavating, Inc., 32 B.R. 947, 950 (Bankr. S.D.N.Y. 1983).

Therefore, had the Second Installment not been paid on the Second Installment Date, (i)

FR UK would have exercised its right of setoff and offset the amount of the Second Installment

against the September 29 Amount, or (ii) if FR UK did not exercise its right of setoff prior to the

filing of the Debtors' bankruptcy cases, FR UK would have held a secured claim for at least the

December 21 Amount.

**(2)     The LCEO Cannot Prove His Required Element Contained In Section 547(b)(5) Because The "Creditor" Did Not Receive More Than It Was Entitled To Receive**

To avoid a transfer under Section 547, the trustee must establish that such transfer

enabled the creditor to whom or for whose benefit the transfer was made to receive more than

such creditor would have received in a Chapter 7 case if the transfer had not been made.  11

U.S.C. § 547(b)(5).  As established above, if ACT US had not paid the Transfer on September

27, 2001 and had filed its Bankruptcy Case under Chapter 7 of the Bankruptcy Code, (i) FR UK

would have performed the FRDSA Setoff, or (ii) if the Second Installment remained unpaid on

the Petition Date, FR UK would have held a secured claim for at least the December 21 Amount.

In In re Nepsco, Inc., 55 B.R. 574 (Bankr. D. Me. 1985), the defendant received

payments from the debtor during the 90-day preference period totaling $6,221.56.  At the time of

the debtor's bankruptcy filing, the defendant owed the debtor $7,250.00.  Id.  The court held the

trustee failed to satisfy his burden of proof under Section 547(b)(5) on the basis that the

defendant "would have been entitled to a right of setoff had the payments not been made and

therefore would have had a secured claim under 11 U.S.C. § 506(a) upon which [defendant]

would have been entitled to full payment."  Id. at 576.

1944826.9                                          11

In In re Mason and Dixon Lines, Inc., 65 B.R. 973, 975 (Bankr. M.D.N.C. 1986), the defendant received payments from the debtor during the 90-day preference period. At the time of these payments, the defendant owed mutual prepetition debt to the debtor in excess of the amount of the payments (although the defendant apparently paid this debt to debtor prior to the bankruptcy filing). Id. at 976-78. The court held that the payments did not meet the Section 547(b)(5) standard. Id. at 977-78. The court reasoned that, absent receipt of these payments from the debtor, the defendant would have had a secured claim under Section 506(a) to the extent of the defendant's right of setoff. Id. at 977. Although the defendant did not actually possess a right of setoff on the date of the bankruptcy filing (having paid its prepetition debt to the debtor prior to the bankruptcy filing), the court explained that "absent payments from [the debtor] the creditor would have taken an offset and not 'voluntarily' relinquished this right." Id. at 978; see also Braniff Airways, 814 F.2d at 1041, fn. 11 ("The fact that a setoff never actually took place does not affect the analysis. The issue is whether [the creditor] hypothetically had the right to a setoff, and because of this right it was secured and therefore the payment received from [the debtor] was not a voidable preference.").

The facts in this case fit squarely within the reasoning of the Nepsco and Mason and Dixon Lines cases. FR UK owed amounts well in excess of the amount of the Second Installment for purchases under the FRDSA on both the Second Installment Date and the Petition Date, resulting in an available setoff under Section 553 for at least the full amount of the Second Installment. (SOF ¶¶ 22, 28) The setoff right available to FR UK prevents the Transfer from being avoidable because if ACT US had not paid the Transfer, FR UK would have nonetheless received the full amount of the Second Installment by virtue of either the FRDSA Setoff or a secured claim in at least the December 21 Amount. See, e.g., Nepsco, 55 B.R. at 576.

(3)     **The LCEO Cannot Avoid The Transfer Because Of A Contemporaneous
Exchange For "New Value" Under Section 547(c)(1)**

Under Section 547(c)(1), the trustee cannot avoid an otherwise preferential transfer to the

extent such transfer was "(A) intended by the debtor and the creditor to or for whose benefit such

transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B)

in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1). Assuming,

arguendo, that the LCEO can proceed with his Complaint in the absence of the "creditor" or a

"transferee," the Transfer also cannot be avoided under Section 547(c)(1).

If the Second Installment had not been paid by the Second Installment Date, FR UK

would have performed the FRDSA Setoff.

On October 2, 2001, FR UK made a payment totaling approximately $1,900,000 (the

"October 2 Payment") for purchases under the FRDSA. If the Second Installment had remained

unpaid on October 2, 2001, FR UK would not have paid the October 2 Payment. By paying the

October 2 Payment, FR UK voluntarily relinquished its right to perform the FRDSA Setoff by

the amount of the October 2 Payment.

In Mason and Dixon Lines (discussed supra), the defendant relinquished its right to setoff

a mutual prepetition debt owed to the debtor after receiving payments from the debtor during the

90-day preference period. 65 B.R. at 978. The court held that, so long as the defendant owed the

debtor an amount at least equal to the amount of the debtor's payment at the time the defendant

received the payments, the defendant's acceptance of the payments necessarily required the

defendant to relinquish its right of setoff, which relinquishment constituted "new value" within

the meaning of Section 547(c)(1). Id.

Therefore, FR UK's voluntary relinquishment of its right to perform the FRDSA Setoff (as established by payment of the October 2 Payment) constituted a substantially contemporaneous exchange for "new value" in accordance with Section 547(c)(1).

**C.    The LCEO Cannot Prove His Required Element Contained In Section 547(b)(4) Because The Transfer Did Not Occur During The Preference Period**

Under Section 547(b)(4), the "transfer" must have occurred on or within 90 days before the Petition Date.  11 U.S.C. § 547(b)(4)(A).

In La Café Crème, Ltd., 244 B.R. 221, 234 (Bankr. S.D.N.Y. 2000), the court held that, for purposes of Section 547(b)(4), installment payments under a purchase agreement are deemed to have been made on the date of the execution of the purchase agreement, not the date the defendants received the installments.  The court reasoned as follows:

> Because it is undisputed that the LeRouxs fully performed under the Purchase Agreement by depositing their shares of stock into escrow and complying with the terms of Xavier Peron's covenant not to compete, the LeRoux's performance is not a divisible unit.  Moreover, the Debtor's obligation to pay the LeRouxs for their full performance, albeit in the form of installments, arose upon execution of the Purchase Agreement and related documents.  The Debtor's installment payments are not divisible transfers of the Debtor's interest in property . . .

Id.

The facts at issue are almost identical to those analyzed in La Café Crème, namely: (i) FR UK sold assets to ACT US under a purchase agreement (SOF ¶ 1); (ii) ACT US agreed to pay a portion of the purchase price in installments (SOF ¶ 3); and (iii) ACT US is seeking to avoid an installment payment alleged to have been made during the applicable preference period (SOF ¶ 8).  Therefore, by application of the analysis in La Café Crème to the facts in this case, for purposes of Section 547(b)(4), the Transfer is deemed to have been made on the date of execution of the Business Sale Agreement (i.e., July 2, 2001), not the subsequent date on which performance occurred through a wire transfer of funds to Emerson (i.e., September 27, 2001). As

a matter of law, the Transfer is deemed to have been made prior to the 90-day preference period

established under Section 547(b)(4). The LCEO cannot establish the most basic of his elements.

**D.    The LCEO Cannot Prove His Required Element Contained In Section 547(b)(3) Because ACT US Was Solvent At The Time Of The Transfer**

For purposes of Section 547(b)(3), ACT US is presumed to have been insolvent on and

during the 90 days immediately preceding the Petition Date. See 11 U.S.C. § 547(f). However,

in the event that Emerson can present evidence that ACT US was solvent on the Transfer Date,

ACT US must affirmatively establish that it was insolvent on the Transfer Date. See In re Ralar

Distributors, Inc., 1992 WL 535959, *3 (D. Mass 1992); In re Keydata Corp., 37 B.R. 324, 327

(Bankr. D. Mass. 1983).

On or about November 14, 2001, ACT US filed its Quarterly Report for the period

ending September 30, 2001 (the "ACT 10-Q") with the Securities and Exchange Commission.

(SOF ¶ 30)  The Condensed Consolidated Balance Sheet (the "Balance Sheet") contained in the

ACT 10-Q indicates that, as of September 30, 2001, the total assets of ACT US and its

subsidiaries exceeded the total liabilities of ACT US and its subsidiaries by $191,172,000. (SOF

¶ 31)

The Balance Sheet rebuts the Section 547(f) presumption of insolvency by providing

evidence that ACT US and its subsidiaries were solvent three days after the Transfer Date. See

In re Boston Publishing Co., Inc., 209 B.R. 157, 172 (Bankr. D. Mass. 1997) (holding that book

values are, in some circumstances, competent evidence of the fair value of property from which

inferences about a debtor's insolvency may be drawn) (citing In re Roblin Industries, Inc., 78

F.3d 30 (2d Cir. 1996)). See also Jones Truck Lines, Inc. v. Full Service Leasing Corp., 83 F.3d

253, 258 (8th Cir. 1996) ("A financial statement showing positive net worth is sufficient to rebut

the presumption of insolvency.") (citing In re Almarc Mfg., Inc., 60 B.R. 584, 586 (Bankr. N.D. Ill. 1986)).

As of the date of this Motion, the LCEO has not provided Emerson with any evidence affirmatively establishing that ACT US was insolvent on the Transfer Date. Accordingly, based on the evidence in the record to-date, the LCEO cannot establish ACT US was insolvent at the time of the Transfer and meet his burden of proof.

**E.    The LCEO Is Estopped From Avoiding The Transfer**

Estoppel "is based upon notions of fair dealing and good faith" and "is employed to prevent the inequitable assertion of rights which would otherwise exist to the detriment of an opposing party who has been mislead." In re Collier, 307 B.R. 20, 27-28 (Bankr. D. Mass. 2004).

Under the doctrine of judicial estoppel, a party is precluded "from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another." Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 12 (1st Cir. 1999).

Likewise, the doctrine of equitable estoppel requires "(1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; and (3) detriment to such person as a consequence of the act or omission." Colarusso v. Ragosa, 382 F.3d 51, 60-61 (1st Cir. 2004).

In June, 2002, the Debtors sought to sell substantially all their assets to Baring Asia II Holdings (12) Limited (BVI) ("Baring"). (SOF ¶¶ 33-34). Emerson and certain of its affiliates and divisions conditionally objected to such sale. (SOF ¶ 35)

Ultimately, after a two-day auction and hearing, on July 2, 2002, the Court entered its

Order (I) Approving and Authorizing Debtors to Enter Into Asset and Purchase Agreement with

Benchmark Electronics, Inc. and (II) Approving Debtors' Assumption and Assignment of

Executory Contracts to Benchmark Electronics, Inc. (the "Sale Order"), authorizing the Debtors

to sell certain assets, including the shares of ACT UK, to Benchmark Electronics, Inc.

("Benchmark") and to assume and assign certain executory contracts to Benchmark. (SOF ¶ 36)

Again, assuming, arguendo, that the Complaint can proceed, which Emerson expressly

denies, Emerson is entitled to summary judgment because at least two provisions of the Sale

Order estop the LCEO from seeking to avoid the Transfer under Section 547.

### (1)   **Paragraph 12 Of The Sale Order**

Paragraph 12 of the Sale Order provides:  "Sellers [i.e., the Debtors] are hereby deemed

to have waived all of their rights to receive payment from any non-debtor party pursuant to or on

account of transactions in any way related to any Purchased Contract." (SOF ¶ 38)

The Bankruptcy Code defines "claim" as "right to payment, whether or not such right is

reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

undisputed, legal, equitable, secured, or unsecured . . ." 11 U.S.C. § 101(5)(A) (emphasis

added).  Therefore, under a plain language interpretation of paragraph 12 of the Sale Order, ACT

US waived all "claims" (including legal claims) against "any non-debtor party pursuant to or on

account of transactions in any way related to any Purchased Contract." (SOF ¶ 38)

Based on the following undisputed facts, this adversary proceeding constitutes ACT US's

assertion of a legal claim against Emerson (i.e., the avoidance and recovery of the Transfer) on

account of a transaction (i.e., the payment of the Second Installment under the Business Sale

Agreement) that is related to one of the Purchased Contracts (i.e., the FRDSA):

(a)     Section 1.8(c) of the Business Sale Agreement expressly required ACT US to enter into the FRDSA (SOF ¶ 5);

(b)     Section 7.16 of the Business Sale Agreement expressly permitted FR UK to set off amounts owing under the Business Sale Agreement against amounts owing under the FRDSA (SOF ¶ 6);

(c)     The FRDSA permitted FR UK to set off amounts owing under the Business Sale Agreement against amounts owing under the FRDSA (SOF ¶ 16); and

(d)     The payment of all unpaid amounts due and owing under the Business Sale Agreement is a "cure condition" to the assumption and assignment of the FRDSA (SOF ¶¶ 39, 41).

Pursuant to paragraph 12 in the Sale Order, ACT US assumed and maintained the position that it had waived all "claims" against non-debtor parties "on account of transactions in any way related to the Purchased Contracts." By consenting to entry of the Sale Order, Emerson and FR UK acquiesced in this position. ACT US is now asserting the opposite position, i.e., the enforcement of a legal claim against a non-debtor party on account of a transaction related to two of the Purchased Contracts. Therefore, the LCEO is estopped from avoiding and recovering the Transfer.

(2)     **Exhibit B To The Sale Order**

At the conclusion of the two-day hearing on the Sale Motion, the Bankruptcy Court entered the Sale Order, authorizing the sale of the Debtors' assets to Benchmark pursuant to the terms and conditions of the Benchmark Agreement. (SOF ¶ 36) In paragraph 9 of the Sale Order, the Bankruptcy Court approved the assumption and assignment of the Purchased Contracts to Benchmark subject to satisfaction of the Cure Conditions contained on Exhibit B to the Sale Order. (SOF ¶ 37)

As a condition to its agreement to consent to the assumption and assignment of the Supply Agreements to Benchmark, Emerson required that the Sale Order provide for the payment in full of all amounts due and owing under the Business Sale Agreement. (SOF ¶ 40)

The Cure Conditions contained in Paragraph B on Exhibit B to the Sale Order required that, to the extent not paid prior to the Benchmark Closing, Benchmark would pay in full the amount due and owing under the Business Sale Agreement. (SOF ¶¶39, 41)  Therefore, if the Second Installment had not been paid prior to the Benchmark Closing, the Second Installment would have been required to be paid under the Sale Order. (SOF ¶ 42)

Pursuant to the Cure Conditions contained in the Sale Order, ACT US assumed and maintained the position that all amounts owing under the Business Sale Agreement would be paid in full.  By consenting to entry of the Sale Order, Emerson and FR UK acquiesced in this position.  ACT US is now asserting a contrary position, i.e., that all amounts owing under the Business Sale Agreement should not be paid in full by virtue of the LCEO's avoidance and recovery of the Transfer.  Therefore, the LCEO is estopped from avoiding and recovering the Transfer.

In the absence of such an estoppel, FR UK would be severely prejudiced by reliance on ACT US's previous position that all amounts owing under the Business Sale Agreement would be paid in full in connection with the Benchmark Closing.  The LCEO should not be allowed to ignore the prior positions taken before this Court by the Debtors, nor should the LCEO be allowed to evade a prior Court order that was relied upon by a party appearing before this Court and consenting to the relief granted by the Court for the benefit of the Debtors' estate.

## CONCLUSION

Each of the foregoing arguments is sufficient, standing alone, to establish Emerson's right to summary judgment in this case.  No genuine issue of material fact is disputed and Emerson is entitled to judgment as a matter of law on each of the grounds set forth in this Motion.

WHEREFORE, Emerson respectfully requests that the Court enter judgment in favor of

Emerson on the sole count of the Complaint and for such other and further relief as this Court

deems just and proper.

Dated: October 14, 2004                          **EMERSON ELECTRIC CO.**

*By its counsel,*

_Karen W. Fries_
_____
Karen W. Fries *(Admitted Pro Hac Vice)*
David M. Unseth *(Admitted Pro Hac Vice)*
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
314-259-2000
314-259-2020 (facsimile)

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing has been served via U.S. mail, postage prepaid, on this 14th day of October, 2004 on the following:

Douglas Gooding
Kara Zaleskas
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, Massachusetts 02109

_Karen W. Fiie_